UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TERRENCE PAYNE,

    Plaintiff,

  v.                                                      Case No. 19-CV-1206-SCD

ANDREW M. SAUL,
**Commissioner of Social Security,**

    Defendant.

## DECISION AND ORDER

    Terrence Payne applied for Social Security benefits in 2015, alleging that he is unable to work due to various physical and mental impairments. Following a hearing, an administrative law judge (ALJ) determined that Payne remained capable of working notwithstanding his impairments. Payne now seeks judicial review of that decision.

    Payne argues that the ALJ erred in weighing the medical opinion of his treating psychiatrist. The Commissioner contends that the ALJ did not commit an error of law in reaching his decision and that the decision is otherwise supported by substantial evidence. I agree with the Commissioner. Accordingly, his decision will be affirmed.

## BACKGROUND

    Payne was born on December 27, 1970, in Milwaukee, Wisconsin; his father died twenty days prior to his birth. R. 408.[1] Payne was the youngest of nine siblings. He reported being raised one of his older sisters, as he was emotionally neglected by his mother. Payne

---

[1] The transcript is filed on the docket at ECF No. 14-2 to ECF No. 14-24.

frequently got into trouble in school, and, by age twelve, he was "on the street, joining gangs and doing bad stuff." R. 408. At age thirteen, he started drinking alcohol and smoking marijuana and cigarettes. The following year, "he started having features suggestive of posttraumatic stress disorder, anxiety, and major depressive disorder." R. 407. Payne's mother kicked him out of the house when he was fifteen years old. R. 1371. He began living with friends and girlfriends and immersed himself "in gang life." R. 980, 1371. Payne was expelled from high school during his sophomore year for fighting, though he later obtained his GED. R. 1371. He has frequently been incarcerated for run-ins with the law, and he has never had stable employment, often working (when he does) through temp agencies. R. 408, 980–81, 1371–72.

On September 24, 2015, Payne applied for supplemental security income from the Social Security Administration (SSA), alleging that he became disabled on May 1, 2014 (when he was forty-three years old). R. 82, 267–72. Payne asserted that he was unable to work due to the following mental-health conditions: post-traumatic stress disorder, high anxiety, major depressive disorder, mixed emotions, conduct disorder, and adjustment disorder. R. 82. After his applications were denied at the local level, *see* R. 82–91, Payne (along with his attorney) appeared before ALJ Kathleen Kadlec on November 6, 2018, for an administrative hearing, R. 41–81. Payne testified that he was unable to work due to arthritis in his back and hip and an inability to "get along with people." R. 52. He claimed that his physical pain caused difficulties standing, walking, bending over, and lifting. R. 54–55. As for his mental-health symptoms, Payne testified that he has had a problem with authority figures ever since he was a kid and that he feels anxious when in crowds. R. 56.

Applying the standard five-step process, *see* 20 C.F.R. § 416.920(a)(4) on March 28, 2018, the ALJ issued a decision concluding that Payne was not disabled. *See* R. 17–40. The ALJ determined that Payne had not engaged in substantial gainful activity since September 24, 2015, his application date. R. 22. The ALJ found that Payne's physical and mental impairments limited his ability to work, but none (alone or in combination) met or equaled the severity of a presumptively disabling impairment. R. 22–25. The ALJ next determined that Payne had the residual functional capacity (RFC) to perform light work, but (with respect to his mental-health) he "is limited to performing only simple, routine work tasks," he "can make only simple work-related decisions," and "he can have occasional contact with coworkers and supervisors[] but must avoid all contact with the general public." R. 25. In assessing Payne's RFC, the ALJ gave "little weight" to the opinions of Payne's treating psychiatrist, Bababo Opaneye, M.D. *See* R. 30. The ALJ determined that, in light of the above RFC, Payne could work as a routing clerk, an assembler, and a marker; therefore, he was not disabled. R. 31–32.

After the SSA's Appeals Council denied review, *see* R. 1–8, making the ALJ's decision the final decision of the Commissioner of Social Security, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016), Payne filed this action on August 20, 2019. ECF No. 1. The matter was reassigned to this court in April 2020 after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 22, 23. The matter is fully briefed and ready for disposition. *See* ECF Nos. 16, 20, 21.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*,

3

623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*,

*Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

Payne raises only one issue on appeal: that the ALJ erred in weighing the opinion of Dr. Opaneye, his treating psychiatrist. Dr. Opaneye began treating Payne on June 10, 2014. *See* R. 406. At his initial intake evaluation, Payne reported having a long-standing history of psychiatric condition dating back to around age fourteen. R. 407. He attributed his mental-health issues to his physically and emotionally abusive childhood and to witnessing frequent violence "on the street in Milwaukee." R. 407. Payne reported that he had his first psychiatric encounter when he was about ten years for being disorderly in school. R. 408. He also reported multiple psychiatric hospitalizations and claimed to have attempted suicide by drug overdose on at least one occasion. During the mental-status examination, Dr. Opaneye noted that Payne was appropriately dressed and groomed and maintained good eye contact. R. 409. He

5

described Payne's mood as anxious, with a congruent affect and mood. According to Dr. Opaneye, Payne's insight, judgment, and impulse control was "limited to fair" and his fund of knowledge, attention span, concentration, and cognition was "fair to adequate." R. 409. Dr. Opaneye diagnosed chronic post-traumatic stress disorder, major depressive disorder (recurrent, moderate), and cannabis abuse (continuous), and he prescribed psychiatric medication. R. 409–10.

On September 6, 2017, Dr. Opaneye filled out a mental work capacity questionnaire. *See* R. 995–98. He noted that he saw Payne every two to three months for psychiatric medication management. R. 995. Dr. Opaneye opined that Payne was incapable of even low-stress jobs due to his frequent mood swings and anxiety attacks related to "triggers." R. 996. According to Dr. Opaneye, Payne had a moderate restriction in his activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and had experienced three episodes of decompensation within the last year, each lasting at least two weeks in duration. R. 997. Dr. Opaneye further opined that Payne had an occupational and social impairment with reduced reliability and productivity. R. 998.

The ALJ assigned little weight to the opinions contained in the mental work capacity questionnaire. *See* R. 30. The ALJ determined that Dr. Opaneye's opinion that Payne would be unable to perform even low-stress jobs was "inconsistent with the record as a whole, particularly the doctor's own examination reports, since the doctor himself regularly stated that the claimant appeared 'okay' or 'a bit' anxious during his examinations." R. 30. The ALJ further stated that, "[e]ven taking into account the anxious and irritable moods more frequently documented by Ms. Yeske, [Dr. Opaneye's] opinion fails to address or account for

6

[Payne's] repeated noncompliance with treatment." R. 30.

Payne argues that the ALJ didn't provide "good reasons" for discounting Dr. Opaneye's opinion. *See* ECF No. 16 at 9–16; ECF No. 21 at 4–5. He maintains that the alleged inconsistencies with the record are unsupported, as treatment notes frequently document mood swings, anxiety, irritability, and anger outbursts; in Payne's view, Dr. Opaneye was in the best position to analyze his mental-status exams and determine the nature and extent of his mental impairments. Payne also maintains that the ALJ violated SSR 18-3p when she considered Payne's alleged failure to follow prescribed treatment without first finding that he was disabled. Finally, Payne maintains that the ALJ failed to apply several of the regulatory factors used for evaluating medical opinions. According to Payne, if Dr. Opaneye's opinion was properly given controlling—or at least significant—weight, then Payne would have been found disabled at steps three and five of the sequential evaluation process.

"For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(c)(2); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)); *see also* SSR 96-2p, 1996 SSR LEXIS 9, at *1–4 (July 2, 1996). An opinion that is not entitled to controlling weight need not be rejected. Instead, the opinion is entitled to deference, and the ALJ must weigh it using several factors, including the length, nature, and extent of the claimant's relationship with the treating physician; the frequency of examination; whether the opinion is supported by relevant evidence; the opinion's consistency with the record as a whole; and whether the physician is a specialist. *See* 20 C.F.R. § 416.927(c); *see also Ramos v. Astrue*, 674 F. Supp. 2d 1076, 1087 (E.D. Wis. 2009). Moreover,

7

the ALJ must always give "good reasons" to support the weight she ultimately assigns to the treating physician's opinion. *See* § 416.927(c)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). Only "the most patently erroneous reasons for discounting a treating physician's assessment" require reversal. *Luster v. Astrue*, 358 F. App'x 738, 740 (7th Cir. 2010) (citing *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)).

The ALJ did not commit reversible error when weighing Dr. Opaneye's opinion that Payne was incapable of even low-stress jobs. *First*, the ALJ reasonably determined that Dr. Opaneye's opinion was unsupported by the record as a whole and inconsistent with his own examination reports. More often than not, Dr. Opaneye noted in the mental-status exam section of his treatment notes that Payne's reported mood was "okay" or only "a bit" anxious. *See* R. 419, 423, 431, 439, 509, 725, 1052 1356. As the ALJ reasonably found, these findings are inconsistent with someone who suffers from work-preclusive anxiety. Payne contends that "Dr. Opaneye, not the ALJ, was in the best position to interpret the meaning and significance of the mental status examination." ECF No. 21 at 10–11. That may be true. But that doesn't mean the ALJ must except the opinion of a treating source whose own treatment notes are inconsistent with his opinion. Indeed, the regulations require the ALJ to determine whether such medical opinions are consistent with and supported by the record. *See* 20 C.F.R. § 416.927(c)(2)–(4).

The record does contain several mental-status exams where Dr. Opaneye noted Payne's reported mood was "anxious," "irritable," or "depressed." *See* R. 409, 414, 427, 435, 518, 720. Payne contends that these exam notes support Dr. Opaneye's opinion. Maybe. But Payne does not explain how these exams outweigh the many others where he reported his anxiety was under control. *See Scheck*, 357 F. 3d at 699 (citation omitted) ("[T]he ALJ's

8

decision, if supported by substantial evidence, will be upheld even if an alternative position is also supported by substantial evidence."). And, as we'll see next, the ALJ did consider exam notes where Payne's mood was more frequently documented as anxious or irritable.

*Second*, the ALJ reasonably determined that Dr. Opaneye's failure to address or account for Payne's repeated noncompliance with treatment was another reason for discounting his opinion, notwithstanding exams documenting an anxious or irritable mood. The record is replete with references to Payne's failure to take his medication as prescribed and continued use of alcohol and marijuana, despite his doctors' (including Dr. Opaneye's) warnings that compliance was crucial to his mental health. *See, e.g.*, R. 418–420 (counseled about importance of taking Paxil, despite its sexual side effects), 422–24 ("The patient was informed by this MD that he needs to stop the cannabis because it will worsen his mood and anxiety symptoms. It will also cause paranoia."), 426–28 ("He reported he ran out of his medication 4-6 weeks ago. . . . He was psychoeducated by this MD on the danger of smoking marijuana vis-à-vis increased paranoia and anxiety. . . . This MD also informed him of the danger of poor treatment compliance."), 430–32 (discussing "persistent use of marijuana"), 434–36 ("He verbalized he ran out of his medication a few weeks ago because he missed his appointment. . . . The patient was psychoeducated on the need for him to discontinue use of cannabis and all illicit substances as it can worsen his psychiatric symptoms."), 438–40 ("He verbalized he has not been taking the Paxil because of a burning sensation in his throat when he takes it with water. . . . He was encouraged to discontinue the use of cannabis which could worsen his mood and anxiety symptoms."), R. 443–45 ("He was encouraged to discontinue the use of cannabis as this could worsen paranoia and increase anxiety."), R. 581 (noting continued use of THC), 615 ("Terry reported that he recently missed an appointment with

9

his prescribing psychiatrist and noted that he ran out of all his medications approximately one week ago."), 719 ("He was informed by this MD that as long as he uses illicit substances and alcohol, his PTSD, mood and anxiety symptoms are bound to worsen. Consequently, he needs to get into either an intensive outpatient or inpatient drug treatment to deal with his substance use problem."), 747 ("Terry did not arrive for his scheduled appointment today."), 757 (noting failure to schedule an appointment with a drug-addiction counselor), 1051 ("Patient reported he occasionally skips his psychotropic medication because of intolerable side effect of sexual dysfunction."), 1355 ("He was psycho educated on the danger of poor treatment and of fallow-up compliance including acute decompensation of his mental health condition.").

The record also frequently notes that Payne's mental-health symptoms significantly improved when he took his medications and worsened when he did not. *See, e.g.*, R. 438 ("He reported significant improvement in his mood swings, anger outbursts and anxiety symptoms since he started back on his psychotropic medications."), 615 (Payne admitting that "he 'becomes an asshole' when he does not take his medication"), 799 ("He eventually acknowledged that things do not tend to work well when he is not using his medication."), 939 ("His partner noted that he is more irritable and agitated, perhaps as a result of this medication deficit."), 1051 (noting that Payne "often get[s] irritable and anxious when he is not on his medication."). Consequently, the record amply supported the ALJ's inference that the severity of Payne's symptoms would be diminished if he followed his doctors' advice. And the ALJ reasonably discounted Dr. Opaneye's opinion for failing to address this fact. *See Weaver v. Berryhill*, 746 F. App'x 574, 579 (7th Cir. 2018) ("This non-compliance allowed the inference that the severity of her symptoms would be diminished if she followed her doctors' advice.") (citation omitted).

Relying on *Campbell v. Astrue*, 627 F.3d 299 (7th Cir. 2010), Payne maintains that his continued drug and alcohol use was not a good reason for rejecting Dr. Opaneye's opinion. *See* ECF No. 16 at 11. In *Campbell*, the Seventh Circuit found that the ALJ erred in relying on the opinion of a non-examining medical expert who erroneously believed that the claimant's continued use of alcohol impacted his function; the record actually showed that the claimant's mental-health symptoms persisted even when he was sober. *See Campbell*, 627 F.3d at 308–09. Here, however, there is no evidence that Payne ever stopped smoking marijuana or drinking alcohol for a sustained period. As Payne acknowledges, *see* ECF No. 16 at 14, at best the record shows "occasional" marijuana smoking, R. 724, and cannabis abuse in "partial remission," R. 414, meaning he was still using marijuana. Because the record does not support any significant time period where Payne's mental-health symptoms persisted despite abstinence from drugs and alcohol, *Campbell* is distinguishable, and Payne's reliance on it is misplaced.

Payne also maintains that the ALJ failed to consider whether his noncompliance was a symptom of his mental illness. *See* ECF No. 21 at 12 (collecting cases). However, I don't need to address this argument because it was raised for the first time in Payne's reply brief, and the Commissioner has never had a chance to respond to it. *See Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir. 1997) (citation omitted) ("[A]rguments raised for the first time in the reply brief are waived."). Moreover, the record appears to suggest that Payne's continued use of drugs and alcohol was a deliberate choice rather than a mental-health symptom. *See, e.g.*, R. 734 ("Terry reported that he is not interested in stopping his use of marijuana or alcohol."), 959 ("He reported that nothing was getting in the way of his stopping this usage and stated that he wants to use it.").

Furthermore, the ALJ's consideration of Payne's noncompliance with treatment did not violate SSR 18-3p. That ruling precludes an ALJ from denying a claim based on failure to follow prescribed treatment without finding that the claimant's ability to work would be restored if he were compliant. *See* SSR 18-3p, 2018 SSR LEXIS 1 (Oct. 29, 2018). However, SSR 18-3p "only applies where the ALJ finds that the claimant would be otherwise entitled to disability benefits." *Scharmer v. Comn'r of Soc. Sec.*, Case No. 1:18-cv-00872, 2020 U.S. Dist. LEXIS 65002, at *20 (W.D. Mich. Apr. 14, 2020). It is not a gag rule precluding ALJs from considering lack of compliance in other scenarios. *See Ayala v. Saul*, Civil Action No. 7:19-cv-00024-O-BP, 2020 U.S. Dist. LEXIS 45141, at *15 (N.D. Tex. Feb. 14, 2020) ("Here, the requirements of SSR 18-3p . . . do not apply because the ALJ considered [Plaintiff's] noncompliance merely in assessing the credibility of his complaints."); *Alford v. Commn'r of Soc. Sec.*, CIVIL ACTION NO. 3:18-cv-457-CWR-MTP, 2019 U.S. Dist. LEXIS 156687, at *1–2 (S.D. Miss. Sept. 13, 2019) ("An ALJ can consider a claimant's failure to follow prescribed treatment to assess the claimant's credibility or to determine the severity of a claimant's alleged subjective symptoms without having to mention or follow the requirements of Social Security Ruling ("SSR") 82-59, 1982 SSR LEXIS 25[2]). Because the ALJ here never determined that Payne would be disabled but for his noncompliance, SSR 18-3p does not apply.

*Finally*, the ALJ reasonably applied the regulatory checklist in weighing Dr. Opaneye's opinion. As discussed above, the ALJ rejected Dr. Opaneye's opinion because it was inconsistent with and unsupported by the evidence in the record, R. 30—two of the regulatory factors ALJs are directed to consider, *see* § 416.927(c)(3) (supportability); § 416.927(c)(4)

---

[2] SSR 18-3p rescinded and replaced SSR 82-59, effective October 29, 2018. *See* 2018 SSR LEXIS 1, at *1.

(consistency). Payne accuses the ALJ of not properly considering other factors, namely Dr. Opaneye's treatment relationship with Payne, his specialty, and the consistency of his opinion with the opinion of Payne's counselor, Jo Yeske, L.P.C. *See* ECF No. 16 at 15–16. But the ALJ did mention that Dr. Opaneye was a psychiatrist, that Dr. Opaneye began treating Payne in June 2014, and that Dr. Opaneye frequently examined Payne. *See* R. 26, 28. The ALJ also specifically considered Yeske's observations and opinion in relation to Dr. Opaneye's. *See* R. 30–31. This sufficiently satisfied the ALJ's duty to consider the regulatory factors. *See Collins v. Berryhill*, 743 F. App'x 21, 25 (7th Cir. 2018) (quoting *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008)) ("In weighing a treating physician's opinion, an ALJ must consider the factors found in 20 C.F.R. § 416.927(c), but need only 'minimally articulate' his reasoning; the ALJ need not explicitly discuss and weigh each factor.").

## CONCLUSION

For all the foregoing reasons, I find that the ALJ did not commit reversible error in weighing the opinion of Payne's treating psychiatrist. Thus, the Commissioner's decision is **AFFIRMED**. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 16th day of July, 2020.

_____
STEPHEN C. DRIES
United States Magistrate Judge